DECISION
{¶ 1} Relator, Fred Feltner, filed this original action, which requests a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its orders denying him permanent total disability ("PTD") and to enter an order awarding him PTD compensation.
 {¶ 2} This court referred this matter to a magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a *Page 2 
decision, including findings of fact and conclusions of law, recommending that this court issue a writ of mandamus ordering the commission to vacate the June 20, 2006 order and, in a manner consistent with the magistrate's decision, enter a new order that adjudicates the PTD application filed October 12, 2005. (Attached as Appendix A.) Specifically, the magistrate found no abuse of discretion with respect to the staff hearing officer's ("SHO") April 10, 2003 order, which denied relator's first application for PTD compensation. However, with respect to the SHO's June 20, 2006 order, the magistrate agreed with relator's assertion that the occupational activity assessment prepared by Donald J. Tosi, Ph.D., is inconsistent with Dr. Tosi's narrative report. Thus, the magistrate concluded that the commission's reliance on Dr. Tosi's report constituted an abuse of discretion. No objections to the magistrate's decision have been filed.
 {¶ 3} With respect to Dr. Tosi's report, we note that the Global Assessment Functioning ("GAF") scale correlates a value of 60 — the value Dr. Tosi assessed — with moderate symptoms or moderate difficulty in social, occupational or school functioning. In addition, as the magistrate notes, the commission's medical examination manual correlates such a value with impairment levels that are compatible with some, but not all, useful functioning. Taken together, these sources suggest that a claimant having a GAF rating of 60 may be unable to work without limitations. We are reluctant, however, to conclude that a GAF rating of 60 necessarily precludes an expert from determining that an injured worker can work without limitations.
 {¶ 4} Here, Dr. Tosi found "evidence of reduced social functioning," a finding that is not inconsistent with a GAF rating of 60, which may indicate "moderate difficulty in social * * * functioning." With respect to occupational functioning, however, Dr. Tosi *Page 3 
specifically addressed relator's "[a]daptation to the Workplace" and concluded: "The Injured Worker is able to deal with people, make judgements, plan, perform under normal work stress, and work under specific instructions." As for relator's "Concentration, Persistence, and Pace," Dr. Tosi concluded: "The Injured Worker is able to sustain focus or attention long enough to permit completion of tasks in a low/moderate work environment. He is able to complete a normal workday and work week and maintain regular attendance from a psychological standpoint." Thus, it was not necessarily inconsistent for Dr. Tosi to conclude that relator's impaired social functioning supported a GAF rating of 60, but also to conclude that, based solely on the allowed psychological conditions, relator's impairments did not preclude him from performing his prior position without limitations. Therefore, we conclude that the commission did not abuse its discretion when it relied on Dr. Tosi's report to support the June 20, 2006 order, and, by doing so, we reject relator's sole basis for challenging that order before this court.
 {¶ 5} In summary, we take the following actions. First, we adopt the magistrate's findings of fact. Second, finding no error of law or other defect on the face of the magistrate's decision concerning the April 10, 2003 order, this court adopts the magistrate's conclusions of law relevant to that order. Third, for the reasons detailed above, we do not adopt the magistrate's conclusions of law concerning the June 20, 2006 order, and we reject relator's only basis for challenging that order. Accordingly, we deny the requested writ.
 Writ of mandamus denied. McGRATH, P.J., and SADLER, J., concur. *Page 5 
 APPENDIX A MAGISTRATE'S DECISION Rendered October 4, 2007 {¶ 6} In this original action, relator, Fred Feltner, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its orders denying him permanent total disability ("PTD") compensation, and to enter an order awarding him PTD compensation. *Page 6 
Findings of Fact: {¶ 7} 1. Relator has multiple industrial claims. His last industrial injury occurred on February 18, 1998 while he was employed as a laborer in a plant operated by H. Meyer Dairy Company. This claim, number 98-334389, is allowed for "sprain of neck; sprain lumbar region; contusion of right thigh; hearing loss due to noise, bilateral; tinnitus nos bilateral; aggravation of pre-existing degenerative disc disease; major depressive disorder with anxious features."
 {¶ 8} 2. The other industrial claims and their allowances are as follows:
87-5736 contusion right hip, sprain right wrist
90-55229 contusion right knee, strain right thigh
91-2099 fractured left great toe
95-357006 sprain lumbosacral
95-530714 right inguinal strain
96-343647 open [wound] of jaw
96-542384 contusion of knee, left, abrasion hip and leg, left
97-534566 sprain lumbosacral

 {¶ 9} 3. On September 10, 2002, relator filed an application for PTD compensation.
 {¶ 10} 4. On December 6, 2002, at the commission's request, relator was examined by Ron M. Koppenhoefer, M.D. Dr. Koppenhoefer examined for the allowed physical conditions in the claims, but not for the allowed psychiatric condition in claim number 98-334389. Dr. Koppenhoefer opined:
 In summary, Mr. Feltner would have a 20% whole person impairment when taking into account the physical conditions listed in the above claims.
 Mr. Feltner at this time would be limited to sedentary work activities which would enable him to change his position at will from sit to stand. He would have limitations in regards to prolonged sitting without taking frequent breaks. It is also *Page 7 
noted that his sedentary work position should not deal with a great deal of cognitive complexity because of the current pain medications which he is taking.
 {¶ 11} 5. On December 10, 2002, at the commission's request, relator was examined by psychiatrist Donald L. Brown, M.D. Dr. Brown examined only for the "major depressive disorder with anxious features" allowed in claim number 98-334389. In his narrative report, Dr. Brown opined:
 * * * He is now stabilized with respect to his previously allowed major depressive disorder which anxious features. He has mild impairment with respect to [activities of daily living] and social functioning. He has mild-moderate impairment with respect to his concentration, persistent [sic], and pace and moderate impairment in adaptation. I do not believe that this level of impairment would prevent him from returning to his former position of employment or other forms of sustained remunerative employment.
 OPINION:
 In my opinion, Mr. Feltner has reached MM I with respect to his previously allowed major depressive disorder with anxious features and it can be considered permanent. Utilizing the 4th Edition of the AMA Guides to the Determination of permanent impairment, I would rate him as having a Class III level of impairment. This is a moderate level of impairment. Referencing the percentages from the 2nd Edition in the 4th Edition, I would rate his level of impairment at 30%.
 {¶ 12} 6. Dr. Brown also completed an occupational activity assessment form on December 10, 2002. The form presents the examining psychiatrist with a two-part query:
 Based on the impairment resulting from the allowed/alleged psychiatric/psychological condition(s) only, can this injured worker meet the basic mental/behavioral demands required: *Page 8 
 To return to any former position of employment?
 To perform any sustained remunerative employment?
 {¶ 13} In response, Dr. Brown checkmarked the "yes" responses for both queries.
 {¶ 14} 7. The commission requested an employability assessment report from Christy L. Vogelsang, a vocational expert. In her report dated February 28, 2003, Vogelsang lists seven employment options based upon the medical reports of Drs. Koppenhoefer and Brown. The employment options listed are "Monitor, Operator, Addresser, Microfilmer, Charter, Preparer [and] Sorter." Following her listing of employment options, Vogelsang wrote: "Note: positions would need to be modified to allow sit/stand at will."
 {¶ 15} 8. Following an April 10, 2003 hearing, a staff hearing officer ("SHO") issued an order denying relator's PTD application. The SHO's order of April 10, 2003 states:
 The injured worker was examined at the request of the Industrial Commission by Dr. Morad on January 23, 2003 with regard to the allowed auditory conditions in the claim. Dr. Morad indicated that the injured worker has reached maximum medical improvement with regard to these conditions. The doctor indicated that the injured worker's hearing loss would not prevent the injured worker from returning to his former position of employment.
 The injured worker was examined at the request of the Industrial Commission by Dr. Koppenhoefer on December 6, 2002 with regard to the allowed orthopedic conditions in the claim. Dr. Koppenhoefer indicated that the allowed conditions have reached maximum medical improvement and result in a 20 percent whole person impairment rating. Dr. Koppenhoefer indicated that the injured worker would be limited to sedentary activities which would enable him to change his positions at will from sitting to standing. The *Page 9 
doctor further indicated that the injured worker would be unable to engage in prolonged sitting without taking frequent breaks and that he should not deal with a great deal of cognitive complexity in any sedentary position because of the current pain medication which he is taking.
 The injured worker was examined at the request of the Industrial Commission by Dr. Brown on December 11, 2002 with regard to the allowed psychological conditions in the claim.
 Dr. Brown found that the injured worker seemed to be of average to low average intelligence and was capable of good judgement. He indicated that the injured worker is able to comprehend and reason and that his attention span and ability to concentrate were within normal limits. He further indicated that his memory was in tact for recent and remote event[s].
 Dr. Brown indicated that the injured worker is now stabilized with respect to the allowed conditions in the claim and has mild impairment with regard to social functioning. He further indicated that the injured worker has mild to moderate impairment with respect to concentration, persistence, pace and has moderate impairment in adaptation.
 Dr. Brown concluded that the allowed psychological conditions in the claim has reached maximum medical improvement and result[s] in a class III level impairment.
 Dr. Brown concluded his report by stating that the allowed psychological condition does not prevent the injured worker from returning to his former position of employment or other forms of sustained remunerative employment activity.
 The Staff Hearing Officer finds that the injured worker's psychological and auditory conditions are permanent and have reached maximum medical improvement and do not preclude the injured worker from returning to his former position of employment.
 The Staff Hearing Officer finds that the allowed orthopedic conditions prevent the injured worker from returning to his former position of employment and have reached maximum medical improvement. The Staff Hearing Officer finds that the injured worker would be able to engage in sedentary *Page 10 
work activity within the restrictions and abilities noted by Dr. Koppenhoefer in his December 6, 2002 report.
 The Staff Hearing Officer has reviewed and evaluated the vocational report which was completed at the request of the Industrial Commission by Ms. Christy Vogelsang on February 28, 2003. Ms. Vogelsang found that the injured worker's age of 56 as well as his 12th grade education would be positive factors. She further found that the injured worker's past work history where the injured worker worked as a laborer at a milk company for 31 years would be a positive factor.
 The vocational expert found that the injured worker's continuous work history was a positive factor. The vocational expert found that the injured worker has average academic skills and has the ability to learn new skills as demonstrated by his prior work history.
 The vocational expert found, based upon the report of Dr. Koppenhoefer, the injured worker could be employed as a monitor, operator, addresser, microfilmer, charter, preparer and sorter. The vocational expert noted that these position[s] would need to be modified to allow for a sit to stand option. The vocational expert further found that based upon the reports of Dr. Brown and Dr. Morad that the injured worker would be able to engage in these employment options as well as the former position of employment.
 The Staff Hearing Officer finds that the injured worker is 56 years of age, has a high school education, and can read, write and engage in basic mathematical computations without difficulty, based upon his application filed September 10, 2002. The injured worker's past work history has been as a laborer in a dairy plant where he lifted cases of milk and stacked them on a pallet and loaded them into a tractor trailer.
 The Staff Hearing Officer finds that the injured worker['s] age of 56 would not be a barrier to the injured worker engaging in entry level sedentary employment activity or preclude the injured worker from engaging in any type of rehabilitation efforts in order to return to the work force.
 The Staff Hearing Officer finds that the injured worker's 12th grade education, as well as his ability to read, write and do *Page 11 
basic math are sufficient in order for the injured worker to engage in entry level sedentary employment activity.
 The Staff Hearing Officer finds that the injured worker's educational level would be sufficient in order for the injured worker to learn new skills and engage in any type of academic retraining which may be necessary to engage in other sedentary employment activity.
 The Staff Hearing Officer finds that the injured worker's past work history as a laborer in a dairy plant is a positive factor with regard to the injured worker's ability to engage in sedentary employment activity. The injured worker's work history involves continuous employment with one employer for 31 years. The Staff Hearing Officer finds that this indicates a level of loyalty and dedication to employment which would be valuable to potential employers.
 The Staff Hearing Officer finds that based upon the restrictions and abilities noted by Dr. Koppenhoefer that there are currently a number of positions in which the injured worker could be employed including work as a monitor, operator, addresser, microfilmer, charter, preparer and sorter. The Hearing Officer finds that these positions could be modified in order to allow for a sit and stand option as noted in the report of Dr. Koppenhoefer.
 For the above stated reasons, the Staff Hearing Officer finds that the injured worker is able to engage in sustained remunerative work activity and is not permanently and totally disabled.
 After full consideration of the issue it is the order of the Staff Hearing Officer that the Application filed 09/10/2002, for Permanent and Total Disability Compensation, be denied.
 {¶ 16} 9. On August 21, 2003, relator filed an application for the determination of his percentage of permanent partial disability in claim number 98-334389.
 {¶ 17} 10. On November 28, 2003, relator was examined by James T. Lutz, M.D., for the allowed physical conditions in claim number 98-334389. Dr. Lutz opined:
 OPINION: Fred Feltner, Jr. warrants an 18% whole person impairment as a result of this industrial injury according to *Page 12 
the Fifth Edition of the AMA Guides to the Evaluation of Permanent Impairment.
 {¶ 18} 11. On November 28, 2003, relator was examined by psychologist Chris H. Modrall, Ph.D., who opined:
 Fred Feltner has been allowed for a diagnoses of neurotic depression and recurrent depressive psychosis and it is my opinion that the patient continues to have a 20% permanent partial impairment according to Table 1, page 220, 2nd Ed. of the AMA Guide to Impairment Evaluations. This would be a class 2 impairment according to Table 14-1 on page 363 of the 5th Ed.
 {¶ 19} 12. On December 19, 2003, at the request of the Ohio Bureau of Workers' Compensation ("bureau"), M.E. Gibson, M.D., determined that relator has sustained a 35 percent whole person impairment as a result of the combined effects of all allowed conditions in claim number 98-334389 based upon the reports of Drs. Modrall and Lutz.
 {¶ 20} 13. On December 23, 2003, citing Dr. Gibson's report, the bureau mailed a tentative order finding that relator is entitled to an award of 35 percent permanent partial disability in claim number 98-334389. Apparently, no objection to the bureau's order was filed.
 {¶ 21} 14. On October 12, 2005, relator filed another application for PTD compensation.
 {¶ 22} 15. On November 28, 2005, at the commission's request, relator was examined by Andrew Freeman, M.D., for the allowed physical conditions of the industrial claims. In his narrative report, Dr. Freeman opined:
 * * * Based on the American Medical Association's Guides to the Evaluation of Permanent Impairment — 5th Edition, the *Page 13 
whole person impairment for the allowed physical conditions in the claim is 27%. * * *
(Emphasis sic.)
 {¶ 23} 16. Dr. Freeman also completed a physical strength rating form.
 {¶ 24} 17. On November 28, 2005, at the commission's request, relator was examined by psychologist Donald J. Tosi, Ph.D. In his narrative report dated December 4, 2005, Dr. Tosi wrote:
 Mental Status Examination: Cognitively, the Injured Worker appears to be a man of average intelligence. He is alert, oriented in all spheres, with adequate reality contact. Concentration and attention are mildly reduced. Comprehension of simple commands is unimpaired. Stream of thought and flow of ideas are normal. Educational deficits are absent. There is no evidence of cognitive dysfunction due to psychoses, head injury, or organicity. He denies delusions and hallucinations. His thoughts are clear, understandable, relevant, and goal-directed. Mild paranoid ideations are present. He states, "I don't trust people much anymore." There is no tangentially, circumstantiality, disturbances of logic, or distractibility. His associations are reasonably well organized. The Injured Worker answers questions appropriately. Memory functions are generally intact in all time frames. Short-term memory is intact. Long-term memory is intact. Immediate memory is reduced. He states, "I'm forgetful. It's because of all these stupid pills." He is a fair historian. Abstract reasoning, concept formation, and fund of knowledge are estimated to be within normal limits. He has a functional understanding of everyday objects. His judgement is not impaired. Executive functions (i.e., decision-making, flexibility, social perceptions) are intact and estimated to be within normal limits. Insight is fair.
 * * *
 Concentration, Persistence, and Pace: The Injured Worker is able to sustain focus or attention long enough to permit completion of tasks in a low/moderate work environment. He is able to complete a normal workday and work week and maintain regular attendance from a psychological standpoint. *Page 14 
Impairment: Moderate
 * * *
 Discussion: This claim is allowed for Major Depression with anxious features. The Injured Worker has had ongoing psychological treatment since 1999. Psychological testing (MCMI-III) indicates a broad tendency to exaggerate his responses on DSM-IV Axis I Scales (i.e., anxiety and depression). He continues to be upset with his former employer and with the Worker's Compensation system. Recall, this Injured Worker returned to work on light duty post 1998 injury for approximately one year. He stated, "They fired me. No light duty." There were no indications at that time that any psychological factors were work-prohibitive. His issues were physical.
 Diagnosis: DSM-IV multi-axial classification (injury specific)
 Axis I: Major Depression with anxious features
 Axis II: Diagnosis deferred
 Axis III: See related/unrelated medical conditions
 Axis IV: Unemployed Axis V: GAF 60
 Opinion: The following opinion is based on a reasonable degree of psychological certainty.
 Question 1: Has the Injured Worker reached a maximum medical improvement?
 The Injured Worker has reached maximum medical improvement.
 Question 2: What is the percentage of permanent impairment arising from each of the highlighted allowed conditions in each claim? If there is none, please indicate.
 The AMA Guides 5th Edition, Chapter 14 (Mental and Behavioral Disorders) discusses an approach to evaluate and classify mental and behavioral disorders. However, neither of the Guides' 4th or 5th Editions provides *Page 15 
impairment percentages. The Industrial Commission of Ohio requires a percent impairment be given for each allowed condition.
 Therefore, a Table has been constructed for use by the examiners to assist them in classifying and estimating percent impairment, and in order to fulfill the I.C. requirements. This Table combines the principles for estimating percentage of impairment taken from the Guides 2nd Edition, Chapter 11, Table 1, and the classes of impairment taken from the Guides 5th Edition, Chapter 14, Table 14.1. A checkpoint for consistency is also offered by the Global Assessment of Functioning (GAF), as this value is inversely related to whole person percentage impairment.

 Area of Functioning Level of Impairment
 Activities of Daily Living Class II
 Sustained Concentration
 and Memory Class III
 Social Interaction Class II
 Adaptation Class II
 GAF Value 60
 _____________________________________________________
 Whole Person Impairment Class II

 Percentage of Permanent Impairment-24%
 Question 3: What is the Injured Worker's occupational activity capacity?
 The Injured Worker would be able to return to his former position of employment based solely on the allowed psychological conditions.
 {¶ 25} 18. On December 4, 2005, Dr. Tosi also completed an occupational activity assessment form that is subcaptioned "Mental 
Behavioral Examination." The *Page 16 
form requires the examining psychologist to select one of three responses to complete the pre-printed query:
 Based solely on the impairment resulting from the allowed mental and behavioral condition(s) in this claim within my specialty, and with no consideration of the injured worker's age, education, or work training:
 (V) This injured worker has no work limitations.
 ( ) This injured worker is incapable of work.
 ( ) This injured worker is capable of work with the limitation(s) / modification(s) noted below[.]
 {¶ 26} Dr. Tosi placed a checkmark to indicate that "[t]his injured worker has no work limitations."
 {¶ 27} 19. In support of his second PTD application, relator submitted a report dated July 8, 2005 from William T. Cody. Following the reports from Drs. Freeman and Tosi, Cody issued another report dated January 30, 2006 that is critical of Dr. Tosi's report. Cody states:
 Dr. Tosi underestimates the psychological capacity needed to perform a new kind of work activity with physical and psychological restrictions. The level of impairments he finds eliminates Mr. Feltner from being able to work on a consistent basis in a new kind of work activity. Even mild impairments in the areas that are central to learning a new job can preclude one from adapting to a new kind of job.
 If the faulry [sic] assumption is made that Mr. Feltner has the psychological capacity to work he cannot adjust to and perform a new kind of work. [Sic] He is fifty-eight years of age; he has significant physical restrictions related to his ability to perform work activity, as cited by Dr. Freeman. Additionally he has psychological limitations, discussed by Dr. Tosi that affect his ability to adapt, concentrate, and persist. Under these circumstances he could not be expected to adequately adapt to the new tools, tasks, procedures, and rules involved in performing a new type of *Page 17 
work activity, a type of work that he has not performed in the past. This holds true even for unskilled work. The Industrial Commission defines the age of fifty-eight years as middle age. Being of this age presents barriers to adapting to a new kind of work. When this age is combined with the physical limitations Mr. Feltner has and the emotional restrictions reflected in the record reviewed along with a restricted work history in unskilled manual labor jobs, all these factors serve, along with his age, as contributing to an inability to make vocational adjustments.
 {¶ 28} 20. Following a June 20, 2006 hearing, an SHO issued an order denying relator's second PTD application. The SHO's order states:
 In support of his application, the injured worker has submitted the medical report of Dr. Bruce F. Siegel, dated 04/05/2005. In the opinion of Dr. Siegel, the injured worker is permanently and totally disabled and unable to return to any type of sustained remunerative employment as [a] result of this industrial injury.
 The injured worker has also submitted a report from Dennis J. Schneider, Ed.D. In the opinion of Dr. Schneider, "given the physical and psychological conditions resulting from the 02/18/1998 [injury], it is my professional opinion that Mr. Feltner is permanently and totally disabled from any type of gainful employment."
 In addition to the foregoing medical reports, the injured worker has also submitted two Vocational Assessment reports dated 07/08/2005 and 01/30/2006 respectively. In the opinion of Mr. Cody, considering the injured worker's middle age, educational level, work history and physical/-psychological limitations, there are no jobs in the local or national economies which he would be able to perform. In the opinion of Mr. Cody, the injured worker is therefore permanently and totally disabled from any and all competitive employment. Mr. Cody limits his opinion to Claim #98-334389.
 The injured worker was examined by Andrew Freeman M.D. at the request of the Industrial Commission on 11/28/2005 with respect to the allowed physical/orthopedic conditions in his claims. In the opinion of Dr. Freeman, the allowed physical/orthopedic conditions in the multiple claims have *Page 18 
reached maximum medical improvement with a resulting 27% whole person impairment. Dr. Freeman also completed a Physical Strength Rating form. In the opinion of Dr. Freeman the injured worker is capable of performing physical work activity at the sedentary level. Sedentary work is defined on that form as meaning the ability to exert up to ten pounds of force occasionally and/or negligible amount of force frequently to lift, carry, push, pull or otherwise move objects. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary of [sic] walking and standing are required only occasionally in [sic] all other sedentary criteria are met.
 The injured worker was also examined and evaluated at the request of the Industrial Commission by Donald J. Tosi, Ph.D. on 11/28/2005 with respect to the allowed psychological conditions in the claim. In his report dated 12/04/2005, Dr. Tosi found the injured worker to be a man of average intelligence who is alert and oriented in all spheres, with adequate reality contact. Comprehension of simple commands was found to be unimpaired. The injured worker's stream of thought and flow of ideas was found to be normal. No educational deficients were noted. There was no evidence of cognitive dysfunction due to psychoses, head injury or organicity. The injured worker's thoughts were found to be clear, understandable, relevant and goal directed. Memory functions were found to be generally intact as was the injured worker's short term memory. The injured worker's long term memory was also found to be intact. The injured worker was found to be able to deal with people, make judgments, plan, perform under normal work stress and to work with specific instructions. The injured worker was found to be able to sustain focus and attention long enough to permit him to complete tasks in a low to moderate work environment. From a psychological standpoint, the injured worker was found to be able to complete a normal work day and work week and to maintain regular attendance.
 Dr. Tosi opines that the injured worker has reached maximum medical improvement with respect to the allowed psychological conditions in his claims. Dr. Tosi further opines that the injured worker would be able to return to his former position of employment based solely on the allowed psychological conditions. Dr. Tosi also completed an Occupational Activity Assessment, which is dated 12/14/2005 [sic]. In that assessment, Dr. Tosi opines that the *Page 19 
injured worker has no work limitations with respect to the allowed psychological conditions in his claim.
 It is the finding of the Staff Hearing Officer that all of the allowed conditions in the respective claims have reached maximum medical improvement. It is the further finding of the Staff Hearing Officer that the injured worker is capable of performing sedentary work as reflected in the medical report of Dr. Freeman, dated 11/28/2005 and in the report of Dr. Tosi, dated 12/04/2005.
 Having determined that the injured worker cannot return to his former position of employment, but that he can physically and psychologically perform sedentary work activities, this Staff Hearing Officer now turns to an analysis of whether or not the injured worker's non-medical factors caused him to be unable to engage in any sustained remunerative employment.
 In the present claim, historical perspective is an important factor to consider.
 Previously, the injured worker filed an application for permanent total disability compensation benefits on 09/10/2002. By order dated 04/10/2003, the Industrial Commission denied the injured worker's permanent and total disability application. The Industrial Commission denial of benefits was based upon the medical report of Dr. Koppenhoefer, dated 12/06/2002, the medical report of Dr. Brown dated 12/11/2002 and the Vocational report from Ms. Vogelsang, dated 02/28/2003. In comparing the reports Dr. Koppenhoefer to Dr. Freeman and of Dr. Brown to Dr. Tosi, the Staff Hearing Officer finds that they are remarkably similar, with essentially the same findings.
 At the time, Ms. Vogelsang found that the injured worker's age at that time (56) coupled with his twelfth grade education were both positive factors with respect to his ability to perform sedentary work activities as identified by Dr. Koppenhoefer. Ms. Vogelsang further found the injured worker's continuous work history to be a positive factor in his securing of sedentary employment. Ms. Vogelsang also found the injured worker's average academic skills and ability to learn new skills as demonstrated by his prior work history to be positive factors with respect to his securing of sedentary employment. Ms. Vogelsang was able to identify *Page 20 
at that time a number of sedentary positions which the injured worker could perform considering his age at that time (56), his high school education and his ability to read, write and engage in basic mathematical computations. At that time, the Staff Hearing Officer found the injured worker's age was not a barrier to being engaged in sedentary work. The Staff Hearing Officer at that time also found that the injured worker's age did not prevent him from engaging in rehabilitation efforts in order to return to the workforce. Significantly, this Staff Hearing Officer finds that the injured worker undertook no rehabilitation efforts subsequent to the 04/10/2003 denial of his application, in spite of the fact that the Hearing Officer at that time stated he was capable of engaging in these type of efforts. Based upon the injured worker's age at that time, his prior work history, and his intellectual capacity, the Staff Hearing Officer at that time found the injured worker could engage in specific sedentary employment activity.
 It is well established that a mere increase in age, rather than the allowed disability, may not be the sole causative factor to support an award of permanent total disability. Permanent total disability compensation was never intended to compensate an injured worker for simply growing older.
 This Staff Hearing Officer finds that since the initial denial of his permanent and total disability application on 04/10/2003, the injured worker has done nothing more than grow older. He is now 59 years old instead of 56 years old. The Staff Hearing Officer finds that there have been no other changes since the denial of benefits in 04/10/2003 that support a change in status supporting his new request. At hearing, the injured worker argued that there have been three changes which now support the application. Specifically, he pointed to a permanent partial disability award, "experience" with his spinal stimulator since 2002, and that there is now in file "a better quality Vocational report than was available in 1993."
 This Staff Hearing Officer does not find the reports of Mr. Cody to be of better quality than that previously provided by Ms. Vogelsang. It is a different report, but not one better in quality than Ms. Vogelsang's report.
 The spinal cord stimulator was approval [sic] in 2002, prior to the initial permanent total disability application denial. It is not a change in circumstance subsequent to that denial. *Page 21 
 The Hearing Officer does not find that an increase in the percentage of permanent partial disability constitutes a sufficient change by itself upon which to base an award of permanent total disability compensation benefits.
 This Hearing Officer remains persuaded that the injured worker is capable of performing sedentary work duties as identified in the prior Industrial Commission decision dated 04/10/2003, and as recently confirmed by Dr. Koppenhoefer and Dr. Tosi. This Staff Hearing Officer remains further persuaded that the injured worker is not barred by his age, or his past work history from performing sedentary work as identified as above. The Staff Hearing Officer finds that the injured worker's educational level is sufficient to permit him to learn new skills and engage in academic retraining necessary to perform sedentary employment activity. This Staff Hearing Officer finds that the injured worker's failure to engage in any vocational rehabilitation and further training subsequent to 04/10/2003 is a negative factor with respect to his present application. This Staff Hearing Officer further finds that the injured worker's work history further establish [sic] that he can perform sedentary employment activity.
 In conclusion, this Staff Hearing Officer finds that the injured worker is capable of performing sedentary work activities considering his present age, his prior work history and his level of academic and educational skills. The Staff Hearing Officer finds that the only change since the last denial of benefits has been his increase in age, and this does not support an award of permanent total disability compensation benefits. Accordingly, the injured worker's application is denied.
 This order is based upon the reports of Dr. Koppenhoefer and Dr. Tosi, and the Industrial Commission order dated 04/10/2003 and the evidence cited in it.
 {¶ 29} 21. On February 28, 2007, relator, Fred Feltner, filed this original action.
Conclusions of Law: {¶ 30} Both orders of the commission are under challenge here. With respect to the SHO's order of April 10, 2003, the issue is whether the commission abused its *Page 22 
discretion in determining that relator could perform sedentary work that allows for the restriction against prolonged sitting. With respect to the SHO's order of June 20, 2006, the issue is whether Dr. Tosi's occupational activity assessment is inconsistent with his narrative report.
 {¶ 31} The magistrate finds no abuse of discretion with respect to the SHO's order of April 10, 2003 that denied the first application for PTD compensation. However, with respect to the SHO's order of June 20, 2006, the magistrate finds that Dr. Tosi's occupational activity assessment is inconsistent with his narrative report, and thus the commission's reliance upon Dr. Tosi's report constitutes an abuse of discretion.
 {¶ 32} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 33} Turning to the first issue, the SHO's order of April 10, 2003 states in part:
 The vocational expert found, based upon the report of Dr. Koppenhoefer, the injured worker could be employed as a monitor, operator, addresser, microfilmer, charter, preparer and sorter. The vocational expert noted that these position[s] would need to be modified to allow for a sit to stand option. * * *
 * * *
 The Staff Hearing Officer finds that based upon the restrictions and abilities noted by Dr. Koppenhoefer that there are currently a number of positions in which the injured worker could be employed including work as a monitor, operator, addresser, microfilmer, charter, preparer and sorter. The Hearing Officer finds that these positions could be modified in order to allow for a sit and stand option as noted in the report of Dr. Koppenhoefer.
 {¶ 34} According to relator, the employment options listed by vocational expert Vogelsang "do not exist, but must be created specially for Mr. Feltner." (Relator's reply brief.) However, relator submitted no vocational report or evidence indicating that the *Page 23 
positions listed by Vogelsang cannot be modified to allow a worker "to change his position at will from sit to stand," as Dr. Koppenhoefer required.
 {¶ 35} Moreover, if one or more of the employment options listed by Vogelsang can be modified "specially for Mr. Feltner," why would that not provide sustained remunerative employment for Mr. Feltner? Clearly, a job that can be specially modified to fit a claimant's restrictions provides sustained remunerative employment, contrary to relator's suggestion here.
 {¶ 36} Furthermore, it is well-settled that the commission is the expert on the nonmedical factors. State ex rel. Jackson v. Indus.Comm. (1997), 79 Ohio St.3d 266, 271. Relator points to nothing in the record that might detract from this court's traditional deference to the commission in this regard.
 {¶ 37} Accordingly, the commission did not abuse its discretion in denying relator's first application for PTD compensation.
 {¶ 38} The second issue, as previously noted, is whether Dr. Tosi's occupational activity assessment is inconsistent with his narrative report so that his report cannot constitute evidence upon which the commission can rely.
 {¶ 39} A medical report can be so internally inconsistent that it cannot be some evidence upon which the commission can rely. State exrel. Lopez v. Indus. Comm. (1994), 69 Ohio St.3d 445; State ex rel.Taylor v. Indus. Comm. (1995), 71 Ohio St.3d 582. However, a court will not second-guess a doctor's medical expertise to support a claim of internal inconsistency. State ex rel. Young v. Indus. Comm. (1997),79 Ohio St.3d 484. *Page 24 
 {¶ 40} Relator attaches to his brief a copy of the Global Assessment of Functioning ("GAF") scale set forth in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV-TR).
 {¶ 41} The GAF scale runs from zero to 100. A rating from 91 to 100 is described as superior functioning.
 {¶ 42} A GAF rating from 51 to 60 is described as follows:
 Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).
(Emphasis sic.)
 {¶ 43} The magistrate also notes that GAF is referenced in the section of the commission's medical examination manual that is captioned: "Mental and Behavioral Examinations." That section contains a table stated by the manual to be "useful in summarizing impairment assessment of an injured worker." The table indicates that a GAF value from 51 to 60 presents a "Class 3 Moderate" impairment which is described as follows: "Impairment levels are compatible with some, but not all, useful functioning."
 {¶ 44} In his narrative report, under the diagnosis, Dr. Tosi wrote: "Axis V: GAF 60." Under his "opinion," Dr. Tosi repeated the "GAF value" to be at "60."
 {¶ 45} As previously noted, on the occupational activity assessment form, Dr. Tosi selected the statement: "[t]his injured worker has no work limitations." Dr. Tosi did not select the statement: "[t]his injured worker is capable of work with the limitation(s) / modification(s) noted below." *Page 25 
 {¶ 46} The magistrate finds that Dr. Tosi's occupational activity assessment is inconsistent with his narrative report and most notably with respect to the GAF rating of 60.
 {¶ 47} With a GAF rating of 60, relator's psychological condition is necessarily described as presenting "moderate difficulty in social,occupational, or school functioning." (Emphasis sic.) Obviously, if relator is experiencing even moderate occupational difficulty, it cannot be said that he has no work limitations as reported on the occupational activity assessment form.
 {¶ 48} In his order of June 20, 2006, the SHO specifically notes that "Dr. Tosi opines that the injured worker has no work limitations with respect to the allowed psychological conditions in his claim."
 {¶ 49} In the next paragraph of the order, the SHO concludes that relator is capable of performing sedentary work based upon the reports from Drs. Freeman and Tosi.
 {¶ 50} In the following paragraph of the order, the SHO declares:
 Having determined that the injured worker cannot return to his former position of employment, but that he can physically and psychologically perform sedentary work activities, this Staff Hearing Officer now turns to an analysis of whether or not the injured worker's non-medical factors caused him to be unable to engage in any sustained remunerative employment.
 {¶ 51} Thus, the moderate occupational difficulties presented by the GAF rating of 60 are not taken into account in the SHO's order because the SHO relied upon the occupational activity assessment's declaration that relator "has no work limitations" with respect to the psychological condition. The SHO's reliance upon the occupational *Page 26 
activity assessment has the effect of eliminating the GAF rating from Dr. Tosi's narrative report.
 {¶ 52} The magistrate further notes that Dr. Tosi opined in his narrative report that relator "would be able to return to his former position of employment based solely on the allowed psychological conditions." That the allowed psychological condition does not prevent relator from returning to his former position as a laborer is largely irrelevant when the physical injuries do prevent a return to the laborer position and further restrict relator to sedentary work. Given that the physical injuries restrict relator to sedentary work based upon Dr. Freeman's report, the question for the commission was whether the allowed psychological condition further limits sedentary work in any way.
 {¶ 53} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate its SHO's order of June 20, 2006, and in a manner consistent with this magistrate's decision, enter a new order that adjudicates the PTD application filed October 12, 2005. *Page 1