DECISION
{¶ 1} Relator, Meridia Health System, has filed an original action in mandamus requesting this court to issue a writ of mandamus ordering respondent Industrial *Page 2 
Commission of Ohio ("commission") to vacate its order granting respondent Barbara McGill ("claimant") permanent total disability ("PTD") compensation, and to enter an order denying that compensation.
 {¶ 2} We referred this matter to a magistrate pursuant to Civ. R. 53(C) and Loc. R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court deny relator's request for a writ. (Attached as Appendix A.) No party has filed objections to the magistrate's findings of fact, and we adopt them as our own.
 {¶ 3} Relator has filed objections to three of the magistrate's conclusions of law. First, the magistrate concluded that the commission did not violate the rule established in State ex rel. Zamora v. Indus.Comm. (1989), 45 Ohio St.3d 17, and its progeny. Second, the magistrate concluded that the April 18, 2006 report of Robert L. Byrnes, Ph.D., is not equivocal and is some evidence on which the commission could rely to award PTD compensation. And third, the magistrate concluded that the commission did not abuse its discretion in denying relator's request to subpoena the psychiatric treatment records of Susan L. Padrino. We conclude, however, that the arguments relator raises in support of its objections are essentially the same arguments it raised to the magistrate. We agree with the magistrate's well reasoned and comprehensive analysis of these arguments, and we adopt the magistrate's analysis and conclusions as our own.
 {¶ 4} Based on our independent review of the record, we overrule relator's objections, and we adopt the magistrate's decision, including the findings of fact and *Page 3 
conclusions of law contained in it. Accordingly, we deny relator's request for a writ of mandamus.
Objections overruled, writ of mandamus denied.
TYACK and McFARLAND, JJ., concur.
McFARLAND, J., of the Fourth Appellate District, sitting by assignment in the Tenth Appellate District. *Page 4 
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State ex rel. Meridia Health System,
Relator,
v.
Industrial Commission of Ohio and Barbara McGill,
Respondents.
No. 07AP-826
 MAGISTRATE'S DECISION Rendered July 30, 2008 IN MANDAMUS {¶ 5} In this original action, relator, Meridia Health System, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order awarding permanent total disability ("PTD") compensation to respondent Barbara McGill ("claimant") and to enter an order denying said compensation. *Page 5 
Findings of Fact: {¶ 6} 1. On May 28, 1997, claimant sustained an industrial injury while employed as a critical care nurse for relator, a self-insured employer under Ohio's workers' compensation laws. Claimant was injured while moving a hypothermia machine that struck her on the right shin.
 {¶ 7} 2. Initially, relator certified the industrial claim for "open wound (right) knee, leg, ankle." Thereafter, relator additionally certified the claim for "methicillin resistant staphylococcus aureus ["MRSA"], cellulitis, bronchial asthma, gastroenteritis and contact dermatitis."
 {¶ 8} 3. Following an October 31, 2001 hearing, a staff hearing officer ("SHO") additionally allowed the claim for "depression."
 {¶ 9} 4. Following an April 15, 2004 hearing, an SHO additionally allowed the claim for "postherpetic neuralgia."
 {¶ 10} 5. Following a July 20, 2004 hearing, an SHO terminated temporary total disability ("TTD") compensation effective May 27, 2004, the date of the district level hearing. TTD compensation was terminated on grounds that the industrial injury had reached maximum medical improvement ("MMI") as to all the allowed conditions of the claim.
 {¶ 11} 6. Following a March 1, 2005 hearing, an SHO issued an order that denied a motion claimant had filed July 8, 2004 requesting the payment of bills for services rendered on four dates in early 2004. Unfortunately, the record fails to contain a copy of claimant's motion or copies of the bills at issue. However, the SHO's order of March 1, 2005 explains: *Page 6 
 The Staff Hearing Officer denies claimant's request for payment of bills for service on 01/20/2004, 02/17/2004, 03/17/2004 and 03/27/2004, as these services were not related to injuries sustained in this claim, per Dr. Congeni (09/10/2004), and/or lack of specific relation of these treatments to allowed conditions from claimant's treating physician, Dr. Sauers (04/09/2004 and 01/20/2005).
 {¶ 12} 7. The April 9, 2004 report of James B. Sauers, M.D., cited in the SHO's order of March 1, 2005, states:
 * * * Ms. McGill lacerated her leg in May 1997 while pushing a hypothermia machine at work. This laceration resulted in a serious infection due to Methicillin Resistant Staphylococcus Aureus (MRSA). MRSA are resistant to many drugs, although most remain susceptible to the antibiotic vancomycin. Ms. McGill's infection was treated with long-term vancomycin therapy. It is a medical fact that there are MRSA that are resistant to vancomycin, and Ms. McGill's MRSA obviously falls into this category.
 It is my opinion, as her primary physician since she contracted the MRSA infection, that she has never recovered from the initial infection. Her MRSA tends to become dormant after vancomycin treatment and, over time, has built up a resistance to vancomycin. In addition, the MRSA has mutated, which is why cultures from an active infection do not always show MRSA. However, her continual reinfections are most definitely the direct result of the initial infection.
 The initial infection caused a host defense defect that was not present in Ms. McGill's system prior to the May 1997 injury she sustained at work, and these continued, serious infections have had an extremely detrimental effect on her physical and mental health, and have caused numerous complications, including severe depression, gastroenteritis, contact dermatitis, an increased severity of her bronchial asthma, and post herpetic neuralgia.
 * * *
 Ms. McGill is severely disabled. She is unable to work, in any capacity. Most of the time she cannot perform normal activities of daily living, such as driving a car, walking around *Page 7 
the block, or cooking dinner. There are times, when the infection is dormant, that she tries to be "normal." However, the damage that the repeated infections have caused is severe enough that her "normal" is not a life that you or I could even imagine. It is a life filled with pain, medication, and dependency upon others. Is this damage permanent? Yes. Has she reached "maximum medical improvement?" I certainly hope not, and am currently in contact with physicians at the National Institutes of Health regarding her condition and the recurrent infections.
 In my expert medical opinion, as her primary treating physician since before the initial infection occurred, Ms. McGill's extremely poor physical and mental condition is a direct and proximate result of the initial MRSA infection caused by the injury she sustained at work in 1997.
 {¶ 13} 8. The September 10, 2004 report of Blaise L. Congeni, M.D., cited in the SHO's order of March 1, 2005, indicates that relator requested that Dr. Congeni review medical records related to a hospitalization between January and March 2004. Presumably, the medical records reviewed relate to the bills for service for which payment was denied by the SHO's order of March 1, 2005. Apparently, Dr. Congeni was also asked to review and comment upon Dr. Sauers April 9, 2004 report. In her September 10, 2004 report, Dr. Congeni opines:
 I have reviewed the medical records that have been provided includ[ing] those medical records related to hospitalization between January 2004 and March 2004 of Ms. Barbara McGill. I hold the following opinions to a reasonable degree of medical probability. The questions you have offered, I had attempted to address here.
 [One] You used the term, or at least Dr. Sauers uses the term, that the MRSA that Ms. McGill was infected with on 1997 was "vancomycin resistant". I am unaware of any such results. Perhaps Dr. Sauers is saying that the vancomycin has not cured her and therefore in his opinion one can deduce that it is vancomycin resistant. However, that is not confirmed by laboratory results. For example[,] the Staph aureus was identified during the hospitalization of 07/09/01 *Page 8 
and was found to be vancomycin sensitive. I am unaware of any that demonstrated resistance to vancomycin.
 [Two] It is possible to be infected with Staphylococcus and yet have negative blood cultures. This in no way suggests that organism is "dormant". If the patient had a line infection, though, by definition the blood culture would have to be positive, but with other infections such as cellulitis, positive blood culture may not occur.
 [Three] There is no evidence, and it is not likely, that the organisms that this patient is currently infected with in early 2004 are the same as those acquired in 1997. The organism from early 2004 is methicillin sensitive and even penicillin sensitive. That is distinctly different and therefore not the same organism as in early 1997.
 [Four] Any organism, such as Staphylococcus which is a common skin flora, can be recovered on the skin surface and can later cause infection, but patients who are treated with topical antibiotics to the anterior nares, such as Ms. McGill, generally when there is eradication, it is eradicated from the body. Moreover, if a patient has Staphylococcal organisms on there [sic] skin when they get infected, such as a cellulitis, these organisms will be recovered and are the likely cause of the infection. These will clearly be identified by culture and sensitivity testing. This has not happened.
 [Five] It is not medically probable that MRSA mutates to a MSSA.
 [Six] Certainly it is possible that Ms. McGill, or anyone in the community subsequent to her last treatment in 2000, might be exposed to Staphylococcus aureus which was either sensitive or resistant to methicillin. These organisms are ubiquitous. Currently at our hospital and the hospitals in Akron approximately fifty percent of community acquired Staphylococcal infections are due to methicillin resistant Staph aureus. In the future, trying to establish that such a strain is absolutely the same as occurred in 1997 would be possible only with DNA fingerprinting techniques, and you would need to have both organism[s] to test. Given this information, it is unlikely that they are the same strains.
 [Seven] The studies are somewhat conflicting relative to whether one infection with MRSA makes one more *Page 9 
susceptible to subsequent infection with MRSA. It is possible that those patients infected with MRSA, when another staphylococcal infection occurs, may have the same strain of MRSA. That is why these patients are frequently treated with topical therapy to the anterior nares. Given the facts of this case, it would be unlikely for Ms. McGill to again have the same strain as 1997 MRSA currently causing infection. Subsequent cultures from Ms. McGill demonstrated a different Staphylococcus with a different susceptibility.
(Emphasis sic.)
 {¶ 14} 9. The January 20, 2005 report from Dr. Sauers, cited in the SHO's order of March 1, 2005, states:
 This ongoing medical [dilemma] has had a course of varying severity. The tragic course over the years has been one of slowly progressing deterioration. This entire frustrating course has entirely been since the episode of MRSA these many years ago.
 Extensive and various medical evaluations have failed to reveal the complicating factors of Mrs. McGill's condition, dating to this medical insult. The current condition has rendered her unable to care for herself with the arms now severely compromised so far as use is concerned. As of January 17th, 2005, there has appeared an ulcerated lesion at the base of her left great toe. This is open, painful, erythematous with progressive swelling. (cultures pending)
 Salient features of this tragedy are as follows. 1. The duration dating back to the injury. [2]. Recurrence of th[e]se complications despite transient episodes of improvement but never returned to original health. 3. Intercurrent complications, as with Herpes Zoster, sei[z]ure episodes, generalized pain poorly controlled or relieved, reported febrile periods usually at night. 4. Evaluations by physicians that have had short exposure to the patient and not responsible for the ongoing care or the acute episodes. 5. It is easy to make decisions on other observers part when there is only a small window in the whole picture.
 It is sad seeing this problem of medical deterioration now leading to depression, and possible suicidal thoughts. *Page 10 
Medicine has not made adequate delineation of the complicating factors resulting from this traumatic injury.
 In as much that MRSA colonization can be prolonged, it has not been satisfactorily shown it has been eliminated.
 {¶ 15} 10. On March 29, 2005, claimant filed an application for PTD compensation. In support of her application, claimant submitted a report from Dr. Sauers dated March 21, 2005, stating:
 Ms. McGill is a 40 year old woman who has been a patient of mine for many years. In May of 1997 she sustained an accidental injury thus infecting her with MRSA, during her employment at Meridia Huron Road Hospital. This injury has left Ms. McGill totally disabled and unable to sustain gainful employment. During the years after the accident in 1997 I have been one of many doctors who Ms. McGill calls on in the time of need. She has currently had an exacerbation of her infection involving the skin, which we presume is related to her original problem. It recurs with the same resistant organism and now it seems as if it were here to stay. For weeks we have been observing Ms. McGill twice a week regarding these breakouts. It seems as if it will not let up, not even for a moment. Ms. McGill has lost at least 80% use of her arms and cannot feed or groom herself properly, let alone deal with employment issues. There is also a central nervous types of symptoms, which may even be related to her seizure disorder which is being managed by a neurologist.
 With the recurring pattern of cultures that have been obtained it seems that this organism has become resistant to antibiotics (oral and I.V.). With all of this it seems that the organism has not irradicated. * * *
 This ongoing medical dilemma has had a course of varying severity. Over the years it has been one of slowly progressing deterioration. Extensive and various medical evaluations have failed to reveal the complicating factors of Ms. McGills [sic] condition dating to this medical insult.
 {¶ 16} 11. On April 18, 2006, at the commission's request, claimant was examined by psychologist Robert L. Byrnes, Ph.D., who reported: *Page 11 
 HISTORY OF PRESENT ILLNESS
 * * *
 Ms. McGill denied any history of mental health problems or treatment prior to injury. She says that her first behavioral treatment was within the context of a pain program. She says at that time her therapist thought she was depressed. She reports that the longer time went on without recovery the worse her depression became. She relates significant symptoms to 3 or 4 years ago. She has been hospitalized once and probated once. Currently she is involved in an outpatient intensive care program. She sees a psychiatrist who is currently prescribing Wellbutrin. She says that she remains depressed in spite of treatment.
 * * *
 REVIEW OF MEDICAL RECORDS
 Medical reports were reviewed from Doctors: Wolf and Mushkat.
 DISCUSSION
 Ms. McGill is a 41-year old woman who reports a significant history of work injury, reoccurring infections, ongoing pain, physical limitations and depression. She was not a good historian and did not provide a good mental health history. She denies any history of mental health problems or treatment prior to injury. Since injury she has received both outpatient and inpatient mental health treatment. She is currently involved in a[n] intensive outpatient program three days a week.
 She was somewhat vague when asked about the reasons for her participation.
 * * *
 OPINION
 Based on the findings of the history and examination, it is my opinion that to a reasonable degree of medical probability, Ms. McGill has reached maximum medical improvement relative to her allowed mental condition (Depression). *Page 12 
 From the history is appears that Ms. McGill's activities of daily living have become more restricted since being injured at work, in part because of her allowed mental condition. She reports ongoing social connections. She is involved in purposeful activity. Her adaptive capacity has been taxed.
 According to the AMA Guides to the Evaluation of Permanent Impairment V, I find this claimant's impairment to be as follows:
 • Activities of daily living — Moderate
 • Social functioning — Moderate
 • Concentration, persistence and pace — Moderate
 • Deterioration or decompensation in work-like settings — Moderate
 In my opinion this examinee's overall impairment is moderate and I assign a 35% whole person impairment for her allowed mental condition only.
 {¶ 17} 12. On an occupational activity assessment form dated April 18, 2006, Dr. Byrnes indicated by checkmark: "This injured worker is incapable of work."
 {¶ 18} 13. By letter dated August 2, 2006, relator's counsel requested that the commission hearing administrator issue a subpoena to psychiatrist Susan L. Padrino, M.D., for the production of medical records relating to Dr. Padrino's treatment of claimant. The August 2, 2006 letter explains:
 * * * As you also know, the above claim is allowed for a psychiatric diagnosis, and the claimant has alleged during the Permanent Total Disability process that she is receiving intensive psychiatric treatment related to the allowed psychiatric condition, depression. This office sent a request for records to [Dr. Padrino], attaching a signed Bureau of Workers' Compensation Medical release, but has not received the requested records.
 * * * *Page 13 
 On July 13, 2006, I personally spoke to Dr. Padrino relating to our request for records. Dr. Padrino stated that because the records were related to psychiatric treatment and were not being paid for in the claim, she was not "comfortable" releasing these records. She stated that she would discuss the request with the legal department. To date we have not received these records. The subpoeneaed, and just received, medical records of Jill Mushkat, Ph.D., pertinent records attached, support the need to review the above additionally requested records. In the alternative, we will accept Claimant's stipulation that current psychiatric treatment is not related to the claim.
 {¶ 19} 14. Thereafter, the commission's Cleveland hearing administrator issued a so-called "subpoena letter" informing that relator's request to subpoena Dr. Padrino "is denied for the reason that no good cause shown."
 {¶ 20} 15. Following a February 8, 2007 hearing, an SHO issued an order awarding PTD compensation starting March 21, 2005, the date of Dr. Sauers' report. The SHO's order of February 8, 2007 explains:
 * * * This order is based upon the medical reports of Dr. James Sauers, dated 03/21/2005, and Dr. Robert Byrnes, dated 04/18/2006.
 Barbara McGill, the claimant herein, is 41 years old. Ms. McGill is a high school graduate and completed a nursing program at Huron Road School of Nursing. As an employee of the within employer, Ms. McGill worked for thirteen years as a critical care nurse. June 27, 1997 was her last day at work. Her work history has consisted of jobs in the nursing profession with any special training she has had being related thereto.
 On the within date of injury of 05/28/1997, Ms. McGill was injured while moving a hypothermia machine that struck her on the right shin when it became stuck. The open wound on her leg became infected, as reflected in the allowed conditions. Ensuing complications have resulted in expansion of the allowed conditions in this claim. *Page 14 
 Dr. James Sauers has been the claimant's family physician since she was very young. He is the physician of record in this claim, with regard to the allowed physical conditions. In his report dated 03/21/2005, Dr. Sauers opined that, "Ms. McGill (is) totally disabled and unable to (perform) sustained gainful employment" as a result of the allowed physical conditions. He further notes that, at the time of his report, the claimant had "currently an exacerbation of her infection involving the skin . . ." The 03/15/2004 records from Hillcrest Hospital noted "blood cultures were positive for MRSA," indicating the existence of the allowed methicillin resistant staphylococcus, one year before Dr. Sauers' report. The plethora of medical records on file support Dr. Sauers' 03/21/2005 opinions relative to the ongoing insidious nature of the symptomatology Ms. McGill has experienced since her date of injury, as a result of the allowed conditions herein.
 As a result of the within application being filed, an examination of the claimant was conducted by Dr. Robert Byrnes, with regard to the allowed psychological condition of depression. In his report dated 04/18/2006, Dr. Byrnes opined that, Ms. McGill was "incapable" of performing any employment due to her depression. Dr. Mushkat's records from 04/14/1999 to date document the claimant's ongoing psychological complaints and difficulties that are reflected in Dr. Byrnes' report.
 The Staff Hearing Officer finds that, Ms. McGill is not capable of performing sustained remunerative employment as a result of the allowed conditions in this claim. The Staff Hearing Officer finds that, Ms. McGill is permanently and totally disabled as a result of same and permanent total disability benefits are to be paid to her, commencing on 03/21/2005.
 {¶ 21} 16. On April 11, 2007, the three-member commission mailed an order denying relator's request for reconsideration of the SHO's order of February 8, 2007.
 {¶ 22} 17. On October 9, 2007, relator, Meridia Health System, filed this mandamus action. *Page 15 
Conclusions of Law: {¶ 23} Several issues are presented: (1) whether the March 21, 2005 report of Dr. Sauers constitutes some evidence upon which the commission can rely; (2) whether the April 18, 2006 reports of Dr. Byrnes constitutes some evidence upon which the commission can rely; and (3) whether the commission abused its discretion in denying relator's request for a subpoena to be issued to Susan L. Padrino, M.D.
 {¶ 24} Turning to the first issue, State ex rel. Zamora v. Indus.Comm. (1989), 45 Ohio St.3d 17, prohibits the commission from relying on a medical report that the commission has previously found unpersuasive.
 {¶ 25} In State ex rel. Crocker v. Indus. Comm., 111 Ohio St.3d 202,2006-Ohio-5483, at ¶ 10-11, the court had occasion to succinctly summarize Zamora:
 In Zamora, a physically injured claimant moved simultaneously for an additional psychiatric allowance and permanent total disability based in part on the claimant's depression. Dennis Kogut, Ph.D., and Joseph Mann, M.D., agreed that the claimant suffered from moderate depression, but Dr. Kogut thought that the depression predated the injury.
 The commission granted the additional allowance and, in so doing, in effect rejected Dr. Kogut's opinion. It later denied permanent total disability based in part on Dr. Kogut's report. Claimant challenged that decision and prevailed judicially, as "it would be inconsistent to permit the commission to reject the Kogut report at one level, for whatever reason, and rely on it at another." Zamora, 45 Ohio St.3d at 19[.] * * *
 {¶ 26} In Crocker, the treating neurologist opined that the allowed conditions would improve. The commission rejected that opinion, finding that the claimant had reached MMI. The claimant then sought scheduled-loss compensation. In a new report dated June 10, 2003, the neurologist reiterated his belief that the conditions would *Page 16 
improve. This time, the commission accepted the neurologist's opinion and denied scheduled-loss compensation as premature because the claimant's loss was not permanent.
 {¶ 27} The Crocker court held that the commission's reliance upon the new report to deny scheduled-loss compensation violated theZamora rule. That the new report itself had never been rejected did not save the report under Zamora, because the opinion contained in the new report was essentially the same as the opinion contained in the prior report that was rejected. However, the Crocker court noted that the result does not mean that once a doctor's opinion has been rejected the commission can never rely on any future report from that doctor again.Crocker, at ¶ 16.
 {¶ 28} As the court noted in State ex rel. Value City Dept. Stores v.Indus. Comm., 97 Ohio St.3d 187, 2002-Ohio-5810, while Zamora precludes reliance upon the report once the report has been rejected, it does not preclude reliance on reports by an author simply because one of the author's reports has been rejected. Id. at ¶ 22.
 {¶ 29} Here, relator claims that the April 9, 2004 and January 20, 2005 reports of Dr. Sauers were rejected by the commission in denying payment of medical bills and that, thereafter, in violation ofZamora, the March 21, 2005 report was relied upon to support the PTD award. Relator claims that Zamora was violated because allegedly the March 21, 2005 report is essentially a rehash of the two prior reports. Thus, relator invokes the rules set forth in Crocker prohibiting reliance upon a doctor's opinion that has previously been rejected notwithstanding that the opinion is submitted in a new report. The magistrate disagrees with relator's claim that the Zamora rule was violated *Page 17 
by the commission in awarding PTD compensation based upon Dr. Sauers' March 21, 2005 report.
 {¶ 30} A review of Dr. Sauers' April 9, 2004 and January 20, 2005 reports discloses a failure to specifically relate any treatment received during January, February or March 2004 to an allowed condition of the claim. In fact, specific treatments occurring during those early months of 2004 are not addressed at all in Dr. Sauers' April 9, 2004 and January 20, 2005 reports. The SHO's order of March 1, 2005 simply points out this failure of Dr. Sauers' earlier reports to specifically relate the medical services at issue to the allowed conditions. Accordingly, Dr. Sauers' reports were not accepted as evidence relating to the issue before the commission.
 {¶ 31} By way of contrast, the September 10, 2004 report of Dr. Congeni directly addressed "those medical records related to hospitalization between January 2004 and March 2004."
 {¶ 32} The SHO's order of March 1, 2005 denying payment of the bills states reliance upon Dr. Congeni's report and/or reliance upon Dr. Sauers' failure to specifically relate the treatments to the allowed conditions. Under such circumstances, Dr. Sauers' reports of April 9, 2004 and January 20, 2005 were not necessarily found to be unpersuasive as to the matters contained therein. Given the above analysis, theZamora rule was not violated by the commission's reliance upon Dr. Sauers' March 21, 2005 report in awarding PTD.
 {¶ 33} Turning to the second issue, equivocal medical opinions are not evidence. State ex rel. Eberhardt v. Flxible Corp. (1994),70 Ohio St.3d 649, 657. Equivocation *Page 18 
occurs when a doctor repudiates an earlier opinion, renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement. Id.
 {¶ 34} A medical report can be so internally inconsistent that it cannot be some evidence upon which the commission can rely. State exrel. Lopez v. Indus. Comm. (1994), 69 Ohio St.3d 445; State ex rel.Taylor v. Indus. Comm. (1995), 71 Ohio St.3d 582. However, a court will not second-guess a doctor's medical expertise to support a claim of internal inconsistency. State ex rel. Young v. Indus. Comm. (1997),79 Ohio St.3d 484.
 {¶ 35} Here, relator points to the fact that Dr. Byrnes assessed moderate impairments in (1) activities of daily living, (2) social functioning, (3) concentration, persistence and pace, and (4) deterioration or decompensation in a work-like setting. Dr. Byrnes concluded in his narrative report that claimant's "overall impairment" is moderate and he assigned a 35 percent whole person impairment for her allowed mental condition only.
 {¶ 36} Relator then points to Dr. Byrnes' occupational activity assessment on which he indicated by checkmark: "This injured worker is incapable of work."
 {¶ 37} According to relator, Dr. Byrnes' opinion that claimant is incapable of work is fatally inconsistent with his opinion that overall impairment is moderate. According to relator, Dr. Byrnes' reports must be viewed as an equivocation on the assessment of impairment and the ability to work.
 {¶ 38} This magistrate is reluctant to conclude that, as a matter of law, a psychologist's assessment of overall moderate impairment, including moderate impairment in work-like settings, is necessarily inconsistent with the conclusion that the *Page 19 
claimant is incapable of work due to the allowed mental condition. Likewise, this magistrate is reluctant to conclude that an equivocation has occurred.
 {¶ 39} In Lopez, the commission relied upon the January 26, 1990 report of Dr. Katz to deny a PTD application. The Lopez court concluded, at 449:
 Katz's report, however, while unequivocal, is so internally inconsistent that it cannot be "some evidence" supporting the commission's decision. Despite "normal" physical findings, Katz assessed a high (fifty percent) degree of impairment. He then, however, concluded that claimant could perform heavy foundry labor. Being unable to reconcile these seeming contradictions, we find that the report is not "some evidence" on which to predicate a denial of permanent total disability compensation.
 {¶ 40} In Taylor, the commission relied upon the November 21, 1989 report of Dr. Katz. Discussing its earlier decision in Lopez, theTaylor court concluded that Dr. Katz's report contains the same infirmities as those contained in his report in Lopez. InTaylor, Dr. Katz also assessed a 50 percent permanent partial impairment despite normal findings.
 {¶ 41} In Young, the commission relied upon the May 4, 1993 report of Dr. Rammohan to deny PTD compensation. Initially, the claimant suggested that Dr. Rammohan's findings dictate a higher impairment percentage than the 37 percent impairment he assessed. However, the court concluded that the claimant's assertion would require the court to second-guess the medical expertise of Dr. Rammohan which the court declined to do.
 {¶ 42} The Young court, at 487, also rejected the claimant's invocation of Lopez, stating:
 Claimant's reliance on Lopez is also misplaced. In Lopez, we determined that the commission could not reasonably rely on *Page 20 
a physician's report that, despite a fifty percent impairment rating, found the claimant capable of heavy foundry labor. The present situation is not analogous. Rather than a high degree of impairment, the present claimant's impairment is more moderate at thirty-seven percent. The present claimant, moreover, was not released to heavy employment, which would arguably be inconsistent with her level of impairment. Instead, she was limited to sedentary work. No comparable inconsistency, therefore, exists.
 {¶ 43} Obviously, the trilogy of cases discussed above do not set forth a bright-line test for determining when a doctor's report is so internally inconsistent that it cannot be some evidence upon which the commission can rely.
 {¶ 44} In the magistrate's view, Lopez and Taylor are inapposite to the instant case. In the magistrate's view, a judicial declaration that overall moderate impairment assessment necessarily precludes a finding that the claimant is incapable of work requires this court to second-guess the medical expertise of Dr. Byrnes — something this court should avoid. See State ex rel. Feltner v. HMDC, Inc., Franklin App. No. 07AP-180, 2008-Ohio-467.
 {¶ 45} Accordingly, the magistrate concludes that Dr. Byrnes' reports are some evidence upon which the commission can and did rely.
 {¶ 46} Turning to the third issue, Ohio Adm. Code 4121-3-34(C) provides the commission's rules for the processing of PTD applications.
 {¶ 47} Ohio Adm. Code 4121-3-34(C)(4) states:
 (a) The injured worker shall ensure that copies of medical records, information, and reports that the injured worker intends to introduce and rely on that are relevant to the adjudication of the application for permanent total disability compensation from physicians who treated or consulted the injured worker within five years from date of filing of the application for permanent total disability compensation, that may or may not have been previously filed in the workers' *Page 21 
compensation claim files, are contained within the file at the time of filing an application for permanent total disability.
 (b) The employer shall be provided fourteen days after the date of the industrial commission acknowledgment letter provided for in paragraph (C)(2) of this rule to notify the commission if the employer intends to submit medical evidence relating to the issue of permanent total disability compensation to the commission. Should the employer make such written notification the employer shall submit such medical evidence to the commission within sixty days after the date of the commission acknowledgment letter unless relief is provided to the employer under paragraph (C)(4)(d) of this rule. * * *
 (c) If the injured worker or the employer has made a good faith effort to obtain medical evidence described in paragraph (C)(4)(a) or (C)(4)(b) of this rule and has been unable to obtain such evidence, the injured worker or the employer may request that the hearing administrator issue a subpoena to obtain such evidence. Prior to the issuance of a subpoena, the hearing administrator shall review the evidence submitted by the injured worker or the employer that demonstrates the good faith effort to obtain medical evidence. * * *
 (d) Upon the request of either the injured worker or the employer and upon good cause shown, the hearing administrator may provide an extension of time, to obtain the medical evidence described in paragraphs (C)(4)(a) and (C)(4)(b) of this rule.
 {¶ 48} Here, relator points out that claimant did not submit a psychiatric or psychologist report in support of her PTD application filed March 29, 2005.
 {¶ 49} However, relator did have claimant evaluated on October 13, 2005 by psychologist Robert L. Smith, Ph.D. In his 17-page narrative report, Dr. Smith indicates that, among the medical records he reviewed were the records of Jill Mushkat, Ph.D., who was claimant's treating psychologist prior to claimant's referral to psychiatrist Dr. Padrino, whose records are at issue regarding the request for a subpoena. *Page 22 
 {¶ 50} In his October 13, 2005 report, Dr. Smith states that Dr. Mushkat's records reflect treatment from April 21, 1999 to March 18, 2004. In his report, Dr. Smith devotes two full pages detailing Dr. Mushkat's medical records of treatment.
 {¶ 51} At the February 8, 2007 SHO hearing, relator's counsel states:
 * * * I think it's interesting that there has been no report submitted by a treating psychiatrist or psychologist in support of this application. The only support we have that she is PTD, on the psych condition, is the IC doctor, Dr. Byrnes.
 She has a multiple — she's had a multiple number of psychiatrists and psychologists. Dr. Mushkat treated her for years. She indicates that she was treating with Dr. Padrino, and yet nobody has provided us a report that says this is related to her injury.
 We attempted to get updated medical records from the psychiatric doctors. The Industrial Commission had to subpoena Dr. Mushkat's more recent records. Those are on file. Note that Dr. Mushkat is concerned, starting in about 2004, of self-infliction. He [sic] has concerns that she has a more severe psychiatric condition.
 We called, sent a letter to Dr. Padrino, requesting the records. I even called her and talked to her personally. She informed me that she was not treating her for the Workers' Compensation claim; therefore, she would not send me the records. The Industrial Commission did not subpoena the records. We do not have them.
 * * *
 Until Dr. Byrnes' report came out indicating that she was at this intensive outpatient therapy, that she had been committed — or had been an inpatient twice, we were unaware of these treatments. That's why we started to try to get them. Again, Dr. Mushkat's records were subpoenaed. And they are in the file, although they came in later.
 We have records from Dr. MacDougal, who referred her to Dr. Padrino, because she was cutting back on her inpatient care. If you look at the treatment records from Dr. MacDougal, there's no indication that she actually went to *Page 23 
Dr. Padrino. And it appears that she didn't start Dr. Padrino's treatments until sometime after the reports were due. And, again, we tried to get them, and we could not.
 We did get Dr. MacDougal's updated records. They are not on file, because we did not get them until 2006, being unaware of what was going on. Dr. Noffsinger did review them. I just want to make you aware that the 9/30 of `05 record that he reviewed is not in the file, and it's not in this binder. I'm not trying to slip anything by you.
 {¶ 52} In short, relator has had the medical records of claimant's treating psychologist Dr. Mushkat and those records were reviewed by relator's expert psychologist, Dr. Smith. Relator also received updated records from Dr. Mushkat. Relator also received records from Dr. MacDougal, who referred relator to Dr. Padrino.
 {¶ 53} In the August 2, 2006 letter from relator's counsel to the hearing administrator, relator states that "[i]n the alternative, we will accept Claimant's stipulation that current psychiatric treatment is not related to the claim."
 {¶ 54} Claimant does not claim that her current psychiatric treatment is related to her industrial claim.
 {¶ 55} Given that the August 2, 2006 letter of relator's counsel to the hearing administrator provides an alternative to issuance of the subpoena, relator is in no position here to claim any prejudice from the hearing administrator's denial of the subpoena.
 {¶ 56} Moreover, as the commission argues here, given that claimant's psychiatric treatments are unrelated to her industrial claim, Dr. Padrino's records are irrelevant. Treatment for nonallowed medical conditions cannot be used to advance or defeat a claim for compensation.State ex rel. Waddle v. Indus. Comm. (1993), 67 Ohio St.3d 452. *Page 24 
 {¶ 57} Thus, this magistrate must conclude that the commission's failure to issue a subpoena to Dr. Padrino does not constitute a basis for granting a writ of mandamus.
 {¶ 58} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
 KENNETH W. MACKE, Magistrate *Page 1